3029775-LRB/PMH

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS KEENAN | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. |
| | ) | |
| RYDER SYSTEM, INC., and RYDER | ) | |
| TRUCK RENTAL, INC., a/k/a d/b/a | ) | |
| RYDER TRANSPORTATION SERVICES, | ) | |
| and MIDWEST ICE CREAM COMPANY, | ) | |
| LLC. | ) | |
| | ) | |
|     Defendants. | ) | |

**EXHIBITS A THROUGH F TO DEFENDANTS' NOTICE OF REMOVAL**

## 2014 FLORIDA PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Apr 23, 2014**
**Secretary of State**
**CC2407016496**

DOCUMENT# 176669

**Entity Name:** RYDER TRUCK RENTAL, INC.

**Current Principal Place of Business:**
RYDER TRUCK RENTAL, INC
11690 NW 105 ST
MIAMI, FL 33178

**Current Mailing Address:**
RYDER TRUCK RENTAL, INC
11690 NW 105 ST
MIAMI, FL 33178 US

**FEI Number: 59-0747035**                    **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**
FATOVIC, ROBERT D
11690 NW 105 ST
MIAMI, FL 33178 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                    Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | P | | Title | EVPS |
| Name | COOKE, DENNIS C | | Name | FATOVIC, ROBERT D |
| Address | 11690 NW 105 ST | | Address | 11690 NW 105 ST |
| City-State-Zip: | MIAMI FL 33178 | | City-State-Zip: | MIAMI FL 33178 |
| | | | | |
| Title | VPDC | | Title | VPT |
| Name | GARCIA, ART A | | Name | SUSIK, W DANIEL |
| Address | 11690 NW 105 ST | | Address | 11690 NW 105 ST |
| City-State-Zip: | MIAMI FL 33178 | | City-State-Zip: | MIAMI FL 33178 |
| | | | | |
| Title | VC | | Title | AT |
| Name | GALLO-AQUINO, CRISTINA A | | Name | RABIN, SUSAN |
| Address | 11690 NW 105 ST | | Address | 11690 NW 105 ST |
| City-State-Zip: | MIAMI FL 33178 | | City-State-Zip: | MIAMI FL 33178 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: SUSAN RABIN                    ASST. TREASURER                    04/23/2014

Electronic Signature of Signing Officer/Director Detail                                    Date



## 2014 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# 184062

**FILED**
**Apr 22, 2014**
**Secretary of State**
**CC3528888764**

**Entity Name:** RYDER SYSTEM, INC.

**Current Principal Place of Business:**

11690 NW 105 ST
MIAMI, FL 33178-1103

**Current Mailing Address:**

11690 NW 105 ST
MIAMI, FL 33178-1103

**FEI Number:** 59-0739250                    **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

FATOVIC, ROBERT D
11690 NW 105 ST
MIAMI, FL 33178-1103 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

       Electronic Signature of Registered Agent                     Date

**Officer/Director Detail :**

| | | | | |
|---|---|---|---|---|
| Title | VPCF | | Title | VPS |
| Name | GARCIA, ART A | | Name | FATOVIC, ROBERT D |
| Address | 11690 NW 105 ST | | Address | 11690 NW 105 ST |
| City-State-Zip: | MIAMI FL 33178 | | City-State-Zip: | MIAMI FL 33178 |
| | | | | |
| Title | VPT | | Title | VP TAX |
| Name | SUSIK, DANIEL W | | Name | ALONSO, JOAQUIN A |
| Address | 11690 NW 105 ST | | Address | 11690 NW 105 ST |
| City-State-Zip: | MIAMI FL 33178 | | City-State-Zip: | MIAMI FL 33178 |

| | |
|---|---|
| Title | CHAIRMAN, CEO AND PRESIDENT |
| Name | SANCHEZ, ROBERT E |
| Address | 11690 NW 105 ST |
| City-State-Zip: | MIAMI FL 33178-1103 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: JOAQUIN A. ALONSO         ASST. TREASURER       04/22/2014

      Electronic Signature of Signing Officer/Director Detail               Date



EXHIBIT
B

Rev. 4/16

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-LAW DIVISION

Keenan
**Plaintiffs**

v.

Ryder et al.
**Defendants**

NO: 16-L-003022

Motion Call: "R"  Time: 930  Line #: 14

2005 Trial Date: N/A

## **CASE MANAGEMENT ORDER**

### **(Please check off all pertinent paragraphs and circle proper party name)**

(4231) _____ 1. Written, 213(f)(1), (f)(2) and 214 discovery to be **issued** by _____ or deemed waived

(4296) _____ 2. Written, 213(f)(1), (f)(2) and 214 discovery to be **answered** by _____

(4218) _____ 3. Party depositions, fact, 213(f)(1) and/or (2) depositions to be **completed** by _____

(4288) _____ 4. Subpoenas for treating physicians' deps to be **issued** by _____ or deemed waived

(4218) _____ 5. Treating physicians depositions to be **completed** by _____

(4231) _____ 6. All dispositive motions shall be filed **no later than** _____

(4296) _____ 7. All SCR 215 & 216 discovery **completed** by _____

(4206) _____ 8. (Plaintiff) - (Defendant) - (Add. Party) shall **answer** 213 (f)(3) Interrogatories by _____

(4218) _____ 9. **Plaintiff's 213(f)(3)** witnesses' depositions to be **completed** by _____

(4218) _____ 10. **Defendant's 213(f)(3)** witnesses' depositions to be **completed** by _____

(4218) _____ 11. **Add. party's 213(f)(3)** witnesses' depositions to be **completed** by _____

(4295) _____ 12. **All fact discovery, SCR 213(f)(1) and/or SCR 213(f)(2) discovery is closed. (Circle all applicable)**

(4619) ✓ 13. The matter is continued for subsequent Case Management Conference on October 14, 2016
at 9:30 AM/PM in Room 2208 for:

(A)_____ Proper Service     (B)_____ Appearance of Defendants     (C)_____ Case Value
(D)_✓_ Pleadings Status     (E)_____ Discovery Status              (F)_____ Pre-Trial/Settlement
(G)_____ Mediation Status    (H)_____ Trial Certification            (I)_____ Other

Parties to participate in a 201(k) conference
regarding Plaintiff's alleged defects by 9/16/16.
Midwest Ice Cream is dismissed without prejudice and
right to refile with 30 day of inspection of custs; status per agreement
(4005) _____ 14. Case is DWP'd.     (4040) _____ The case is voluntarily dismissed pursuant to 735 ILCS 5/2-1009.

(4331) _____ 15. Case stricken from     (4284) _____ Motion Stricken or          (4330) _____ Case stricken from
CMC Call                          Withdrawn from Call                       Motion Call.

NAME: Smith Amundsen/KMM
ADDRESS: 150 N. Michigan Ave., #3300
PHONE: 312-641-3200
ATTY ID#: 42007
ATTY FOR PARTY: Defendant Ryder

**E N T E R :**

**J U D G E**

SEP 0 8 2016

☆ COPIES OF ALL PRIOR CMC ORDERS MUST
BE BROUGHT TO ALL CMC COURT DATES.

☆ FAILURE OF ANY PARTY TO COMPLY WITH
THIS CMC ORDER WILL BE A BASIS FOR SCR
219(C) SANCTIONS. FAILURE OF ANY PARTY
TO ENFORCE THIS CMC ORDER WILL CONSTITUTE
A WAIVER OF SUCH DISCOVERY BY THAT PARTY.

**EXHIBIT**
**C**

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, LAW DIVISION

THOMAS KEENAN

                         Plaintiff,                         **2016L003022**

v.                                     Court No: **CALENDAR/ROOM R**

RYDER SYSTEM, INC                           **TIME 00:00**

                          Defendants.                    **PI Other**

### COMPLAINT AT LAW

### COUNT I

NOW COMES Plaintiff, Thomas Keenan, by and through his attorneys, Randall F. Peters & Associates, and complaining of defendant, Ryder System, Inc., states as follows:

1.      That on and prior to June 19, 2014, and at all times subsequent thereto through June 30, 2014, defendant Ryder System, Inc., (hereinafter "Ryder") was a corporation doing business in the state of Illinois and in County of Cook and State of Illinois.

2.      Pursuant to its business purpose, defendant, Ryder, operated, leased, managed, maintained, and controlled a commercial transportation and maintenance business where it owned, leased, maintained, and repaired vehicles, including the vehicle operated by the plaintiff for its intended purposes on June 19, 2014, and at all times relevant hereto.

3.      That on and prior to June 19, 2014, and at all times subsequent thereto through June 30, 2014, Plaintiff, Thomas Keenan, operated truck, NO. 12489, that was maintained by Ryder and/or Ryder Fleet Management Solutions, and owned and/or leased by Midwest Ice Cream Company LLC, a/k/a "Deans", from the Defendant Ryder/Ryder Fleet Management Solutions for the purpose of exercising his duties in delivering ice cream products to various retail ice cream vendors in Cook County, Illinois.

4.      That during the aforesaid period of time, plaintiff, Thomas Keenan, was required to utilize a lift gate on said vehicle for its intended purpose of unloading ice cream products, and at which time said lift gate malfunctioned, and injury was sustained to his back.

5.      That defendant, Ryder, had notice prior to said injury that the equipment it owned, maintained, and/or leased and maintained was dangerous and defective, but kept said vehicle in its defective condition in operation for the intended purpose of delivering ice cream products in Cook County, Illinois.

**EXHIBIT**

**D**

6. At all times material hereto, it was the duty of defendant, Ryder, to exercise ordinary care in the maintenance, repair, and control of said equipment for the safety of plaintiff.

7. That notwithstanding said duty as heretofore alleged in the preceding paragraph, defendant, Ryder, then and there was careless and negligent in one or more of the following ways:

    a. Failed to exercise reasonable care in the maintenance of truck 12489 and its lift gate;

    b. Negligently performed inspections and maintenance on truck 12489 and its lift gate;

    c. Failed to remove said vehicle from service when it knew, or should of know, that it was dangerous and defective for its intended purpose;

    d. Failed to warn plaintiff that truck 12489, and its lift gate, if placed and remaining in service was dangerous and defective.

    e. Failed to perform necessary repairs on truck 12489 and its lift gate to render said vehicle safe for plaintiff operation; and

    f. Carelessly and negligently maintained and repaired the lift gate of truck 12489.

8. By reason of the premises, and as a direct and proximate result of the aforesaid careless and negligent acts, and/or omissions, of defendant, Ryder System Inc., plaintiff was caused to suffer diverse and permanent disabling injuries to his person. He became and was sick, sore, lame and disordered, and has suffered, and will continue to suffer, great pain and agony in body and mind. He was caused to expend and will continue to expend in the future, diverse sums of money for medical care and attention. He has suffered emotional distress, and will continue to suffer in the same manner in the future, and was greatly hindered and prevented, and will be greatly hindered and prevented in the future from performing his ordinary occupation, affairs and duties, and has lost and will continue to lose great gains he would other have made acquired as a result of the permanent disabling injury sustained all to his damage.

    **WHEREFORE**, the Plaintiff, Thomas Keenan, prays that judgment be entered against Defendant, Ryder System Inc, in an amount of money in excess of the jurisdictional limit necessary to bring this action in the Circuit Court of Cook County, Illinois, together with the costs associated with this lawsuit.

_____
Randall F. Peters

Randall F. Peters & Associates
177 N. State Street
3rd Floor
Chicago, Il 60601
Attorney No. 11942

## N THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, LAW DIVISION

THOMAS KEENAN

                     Plaintiff,

v.

RYDER SYSTEM, INC

                     Defendants.

Court No: 2016 L 003022
PLEASE SERVE:
RYDER SYSTEM, INC
CORPORATION
Corporate Creations Network IN
350 S. Northwest Hwy #300
Park Ridge, Il 60068

### SUMMONS

To each defendant:

      YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file appearance, in the office of the Clerk of this Court (located in the Richard J. Daley Center, Chicago, Illinois 60602) within 30 days after service of this summons, not counting the day of service. IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.

To the officer:

      This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

| | |
|---|---|
| There will be a fee of $203.00 to file your Appearance, or you may present an Application to Sue or Defend as a Poor Person (form #CCG-19). If approved by the Presiding Judge, the fee will be waived. | WITNESS,_____, 20____ <br><br> _____ |

| | |
|---|---|
| Name | RANDALL F. PETERS & ASSOC. |
| Attorney for | Plaintiff |
| Address | 177 North State 3ʳᶜ Fl |
| City | Chicago, IL 60601 |
| Telephone | 312-368-1245 Phone |
| Atty. No. | 11942 |

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS



EXHIBIT

E

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, LAW DIVISION

THOMAS KEENAN

                            Plaintiff.

                                              Court No: 16 L 003022

v.

RYDER SYSTEM, INC and
RYDER TRUCK RENTAL, INC. a/k/a
d/b/a    RYDER    TRANSPORTATION
SERVICES. and MIDWEST ICE CREAM
COMPANY. LLC.

                            Defendants.

## SECOND AMENDED COMPLAINT AT LAW

### COUNT I
### RYDER SYSTEM INC

NOW COMES Plaintiff, Thomas Keenan, by and through his attorneys. Randall F. Peters & Associates, and complaining of defendant, Ryder System, Inc., states as follows:

1.    That on and prior to June 19, 2014, and at all times subsequent thereto through June 30, 2014, defendant Ryder System, Inc., (hereinafter "Ryder") was a corporation doing business in the State of Illinois and County of Cook.

2.    Pursuant to its business purpose, defendant, Ryder, operated, leased, managed. maintained, and controlled a commercial transportation and maintenance business where it owned, leased, maintained, serviced, and repaired vehicles, pursuant to agreement, including the vehicle operated by the plaintiff for its intended purposes on June 19, 2014, and at all times relevant hereto.

3.    That on and prior to June 19, 2014, and at all times subsequent thereto through June 30, 2014, Plaintiff, Thomas Keenan, operated truck, No. 12489, that was maintained and serviced by Ryder, and owned and/or leased by Midwest Ice Cream Company LLC, to Dean's Food Company and pursuant to a program maintenance agreement attached hereto as Ex. 1, for the purpose of keeping said vehicle in a mechanically sound condition so Plaintiff can exercise his duties in delivering ice cream products to various retail ice cream vendors in Cook County, Illinois.



**EXHIBIT**
**F**

4.      That during the aforesaid period of time, plaintiff. Thomas Keenan, was required to utilize a lift gate on said vehicle for its intended purpose of unloading ice cream products, and at which time said lift gate was mechanically malfunctioning, and which resulted in injury being sustained to his back as he exercised his duties in delivering ice cream products to certain ice cream vendors in Cook County, State of Illinois.

5.      That defendant, Ryder, had notice prior to said injury that the said equipment of vehicle No. 12489 it owned, maintained, and/or leased and serviced was dangerous and defective, but allowed said vehicle to remain in a defective and mechanically unsound condition while in operation for the intended purpose of delivering ice cream products in Cook County, Illinois.

6.      At all times material hereto, it was the duty of defendant. Ryder, to exercise ordinary care in the maintenance, repair, and control of said equipment for the safety of plaintiff.

7.      That notwithstanding said duty as heretofore alleged in the preceding paragraph, defendant, Ryder, then and there was careless and negligent in one or more of the following ways:

   a.   Failed to exercise reasonable care in the maintenance of truck 12489 and its lift gate;
   b.   Negligently performed inspections and maintenance on truck 12489 and its lift gate;
   c.   Failed to remove said vehicle from service when it knew, or should of know, that it was dangerous and defective for its intended purpose;
   d.   Failed to warn plaintiff that truck 12489, and its lift gate, if placed and remaining in service was dangerous and defective.
   e.   Failed to perform necessary repairs on truck 12489 and its lift gate to render said vehicle safe for plaintiff operation; and
   f.   Carelessly and negligently maintained and repaired the lift gate of truck 12489.
   g.   Carelessly and negligently serviced truck 12489 and failed to exercise performance standards to keep said vehicle and its lift gate in a mechanically sound condition.

8.      By reason of the premises, and as a direct and proximate result of the aforesaid careless and negligent acts, and/or omissions, of defendant. Ryder System Inc., plaintiff was caused to suffer diverse and permanent disabling injuries to his person. He became and was sick, sore, lame and disordered, and has suffered, and will continue to suffer, great pain and agony in body and mind. He was caused to expend and will continue to expend in the future, diverse sums of money for medical care and attention. He has suffered emotional distress, and will continue to suffer in the same manner in the future, and was greatly hindered and prevented, and will be

greatly hindered and prevented in the future from performing his ordinary occupation, affairs and duties, and has lost and will continue to lose great gains he would other have made acquired as a result of the permanent disabling injury sustained all to his damage.

**WHEREFORE**, the Plaintiff, Thomas Keenan, prays that judgment be entered against Defendant, Ryder System Inc, in an amount of money in excess of the jurisdictional limit necessary to bring this action in the Circuit Court of Cook County, Illinois, together with the costs associated with this lawsuit.

## COUNT II

## RYDER TRUCK RENTAL INC a/k/a and d/b/a RYDER TRANSPORTATION SERVICES.

NOW COMES Plaintiff, Thomas Keenan, by and through his attorneys, Randall F. Peters & Associates, and complaining of defendant, Ryder Truck Rental Inc. a/k/a and d/b/a Ryder Transportation Services states as follows:

1.    That on and prior to June 19, 2014, and at all times subsequent thereto through June 30, 2014, defendant, Ryder Truck Rental Inc, a/k/a and d/b/a Ryder Transportation Services was a corporation doing business in the State of Illinois and County of Cook.

2.    Pursuant to its business purpose, defendant, Ryder Truck Rental Inc. a/k/a and d/b/a Ryder Transportation Services operated, leased, managed, maintained, and controlled a commercial transportation and maintenance business where it owned, leased, maintained, serviced, and repaired vehicles, pursuant to agreement, including the vehicle operated by the plaintiff for its intended purposes on June 19, 2014, and at all times relevant hereto.

3.    That on and prior to June 19, 2014, and at all times subsequent thereto through June 30, 2014, Plaintiff, Thomas Keenan, operated truck, No. 12489, that was maintained and serviced by Ryder, and owned and/or leased by Midwest Ice Cream Company LLC, to Dean's Food Company and pursuant to a program maintenance agreement attached hereto as Ex. 1, for the purpose of keeping said vehicle in a mechanically sound condition so Plaintiff can exercise his duties in delivering ice cream products to various retail ice cream vendors in Cook County, Illinois.

4.    That during the aforesaid period of time, plaintiff, Thomas Keenan, was required to utilize a lift gate on said vehicle for its intended purpose of unloading ice cream products, and at which time said lift gate was mechanically malfunctioning, and which resulted in injury being sustained to his back as he exercised his duties in delivering ice cream products to certain ice cream vendors in Cook County, State of Illinois.

5.    That defendant, Ryder Truck Rental Inc, a/k/a and d/b/a Ryder Transportation Services had notice prior to said injury that the said equipment of vehicle No. 12489 it owned, maintained, and/or leased and serviced was dangerous and defective, but allowed said vehicle to remain in a defective and mechanically unsound condition while in operation for the intended purpose of delivering ice cream products in Cook County, Illinois.

6.    At all times material hereto, it was the duty of defendant, Ryder Truck Rental Inc, a/k/a and d/b/a Ryder Transportation Services to exercise ordinary care in the maintenance, repair, and control of said equipment for the safety of plaintiff.

7.    That notwithstanding said duty as heretofore alleged in the preceding paragraph, defendant, Ryder Truck Rental Inc, a/k/a and d/b/a Ryder Transportation Services then and there was careless and negligent in one or more of the following ways:

     a.     Failed to exercise reasonable care in the maintenance of truck 12489 and its lift gate;

     b.     Negligently performed inspections and maintenance on truck 12489 and its lift gate;

     c.     Failed to remove said vehicle from service when it knew, or should of know, that it was dangerous and defective for its intended purpose;

     d.     Failed to warn plaintiff that truck 12489, and its lift gate, if placed and remaining in service was dangerous and defective.

     e.     Failed to perform necessary repairs on truck 12489 and its lift gate to render said vehicle safe for plaintiff operation; and

     f.     Carelessly and negligently maintained and repaired the lift gate of truck 12489.

     g.     Carelessly and negligently serviced truck 12489 and failed to exercise performance standards to keep said vehicle and its lift gate in a mechanically sound condition.

8.    By reason of the premises, and as a direct and proximate result of the aforesaid careless and negligent acts, and/or omissions, of defendant, Ryder Truck Rental Inc, a/k/a and d/b/a Ryder Transportation Services plaintiff was caused to suffer diverse and permanent disabling injuries to his person. He became and was sick, sore, lame and disordered, and has suffered, and will continue to suffer, great pain and agony in body and mind. He was caused to expend and

will continue to expend in the future, diverse sums of money for medical care and attention. He has suffered emotional distress, and will continue to suffer in the same manner in the future, and was greatly hindered and prevented, and will be greatly hindered and prevented in the future from performing his ordinary occupation, affairs and duties, and has lost and will continue to lose great gains he would other have made acquired as a result of the permanent disabling injury sustained all to his damage.

**WHEREFORE,** the Plaintiff, Thomas Keenan, prays that judgment be entered against defendant, Ryder Truck Rental Inc. a/k/a and d/b/a Ryder Transportation Services in an amount of money in excess of the jurisdictional limit necessary to bring this action in the Circuit Court of Cook County, Illinois, together with the costs associated with this lawsuit.

## COUNT III
## MIDWEST ICE CREAM COMPANY, LLC

NOW COMES Plaintiff, Thomas Keenan, by and through his attorneys, Randall F. Peters & Associates, and complaining of defendant, Midwest Ice Cream Company, LLC states as follows:

1.     That on and prior to June 19, 2014, and at all times subsequent thereto through June 30, 2014, defendant Midwest Ice Cream Company, LLC (hereinafter "Midwest") was a corporation doing business in the State of Illinois and County of Cook.

2.     Pursuant to its business purpose, defendant, Midwest owned, operated, leased, managed, maintained, and controlled a fleet of commercial vehicles used in the normal and ordinary course of defendant's business, and pursuant to agreement, retained responsibility to keep said vehicles in a mechanically sound and safe condition, including the vehicle operated by the plaintiff for its intended purposes on June 19, 2014, and at all times relevant hereto.

3.     That on and prior to June 19, 2014, and at all times subsequent thereto through June 30, 2014, Plaintiff, Thomas Keenan, operated truck, No. 12489, one of the commercial fleet vehicle used in the normal and ordinary course of defendant's business which was maintained and serviced by Ryder, and owned and/or leased by Midwest Ice Cream Company LLC, to Dean's Food Company, and pursuant to a program maintenance agreement attached hereto as Ex. 1, for the purpose of keeping said vehicle in a mechanically sound and safe condition so Plaintiff can exercise his duties in the delivery of ice cream products to various retail ice cream vendors in Cook County, Illinois.

4.     That during the aforesaid period of time, plaintiff, Thomas Keenan, was required to utilize a lift gate on said vehicle for its intended purpose of unloading ice cream products, and at which time said lift gate was mechanically malfunctioning, which resulted in injury being sustained to his back as he exercised his duties delivering ice cream products to certain ice cream vendors in Cook County, State of Illinois.

5.     That defendant, Midwest had notice prior to said injury that the said equipment on vehicle No. 12489 which it owned, operated, leased, managed, and controlled was dangerous and defective, but allowed said vehicle to remain in a defective and mechanically unsound condition while in operation for the intended purpose of delivering ice cream products in Cook County, Illinois.

6.     At all times material hereto, it was the duty of defendant, Midwest to exercise ordinary care in the ownership, operation, management, maintenance, repair, and control of truck No. 12489 and its equipment for the safety of plaintiff.

7.     That notwithstanding said duty as heretofore alleged in the preceding paragraph, defendant, Midwest then and there was careless and negligent in one or more of the following ways:

   a.   Failed to ensure exercise reasonable care in the maintenance of truck No. 12489 and its lift gate;
   b.   Carelessly and negligently owned, leased, controlled, and/or otherwise provided a commercial vehicle for use and operation that was in a mechanically unsound and unsafe condition;
   c.   Failed to remove said vehicle from service when it knew, or should of known, that it was dangerous and defective for its intended purpose;
   d.   Failed to warn that truck No. 12489, and its lift gate, if placed and remaining in service was dangerous and defective.
   e.   Failed to adequately provide for the necessary maintenance and repair of vehicle No. 12489 and its lift gate;
   f.   Carelessly and negligently exercised performance standard reviews to keep vehicle No. 12489 and its lift gate in a mechanically sound and safe condition.

8.     By reason of the premises, and as a direct and proximate result of the aforesaid careless and negligent acts, and/or omissions, of defendant, Midwest plaintiff was caused to suffer diverse and permanent disabling injuries to his person. He became and was sick, sore, lame and disordered, and has suffered, and will continue to suffer, great pain and agony in body and mind.

He was caused to expend and will continue to expend in the future, diverse sums of money for medical care and attention. He has suffered emotional distress, and will continue to suffer in the same manner in the future, and was greatly hindered and prevented, and will be greatly hindered and prevented in the future from performing his ordinary occupation, affairs and duties, and has lost and will continue to lose great gains he would other have made acquired as a result of the permanent disabling injury sustained all to his damage.

**WHEREFORE**, the Plaintiff, Thomas Keenan, prays that judgment be entered against defendant, Midwest Ice Cream Company, LLC in an amount of money in excess of the jurisdictional limit necessary to bring this action in the Circuit Court of Cook County, Illinois, together with the costs associated with this lawsuit.

Randall F. Peters

Randall F. Peters & Associates
177 N. State Street 3rd Floor
Chicago, Il 60601
Attorney No. 11942

## RYDER TRUCK RENTAL, INC.
## PROGRAMMED MAINTENANCE AGREEMENT

THIS PROGRAMMED MAINTENANCE AGREEMENT ("Agreement") is made to be effective as of the 1st day of April, 2008 ("Effective Date"), between RYDER TRUCK RENTAL, INC., whose address is 11690 NW 105 Street, Miami, FL 33178 ("Ryder"), and MIDWEST ICE CREAM COMPANY, LLC as it relates specifically to its facility located at 1253 Kingsland Drive, Batavia, IL 60510 ("Customer").

**1.    VEHICLES COVERED AND TERM**

    **A.    Vehicles.** Ryder agrees to provide to Customer all fleet maintenance, repair and other services described in Paragraph 2 below ("Services") for all vehicles including their components (each a "Vehicle" and collectively the "Vehicle(s)") described on each Schedule B attached hereto and on each Schedule E that may hereafter be executed by the parties and made a part of this Agreement (individually and collectively, "Schedule E"). During the term of this Agreement, Customer shall have the right to add Vehicles under the terms and conditions set forth herein and at the rates and charges set forth on Exhibit C attached hereto and incorporated herein. Any such agreement to add a Vehicle shall be evidenced by a Schedule E executed by both parties.

    **B.    [Intentionally omitted.]**

    **C.    Term.** The term of this Agreement for each Vehicle shall commence on the Beginning of Term (as defined in Paragraph 16A below) for that Vehicle and, unless earlier removed from coverage under this Agreement as expressly provided herein, shall continue thereafter for the term of this Agreement. The term of this Agreement shall commence on the Effective Date and shall remain in effect until terminated by either party as expressly provided herein.

**2.    SERVICES**

    **A.** Ryder shall perform the following Services for each Vehicle during the term of this Agreement for such Vehicle and in conformance with the performance standards set forth on Exhibit A, attached hereto and incorporated herein ("Performance Standards"):

        (1)    Maintenance: Ryder shall provide all maintenance, repair and other vehicle related services for the Vehicles as required to keep the Vehicles in a condition that is mechanically sound, that is within manufacturer's specifications and that meets or exceeds the Running Condition Standards (as defined below) (collectively, "Maintenance") including, without limitation, maintenance and repair services relating to wear and tear, state and regulatory inspection and Preventive Maintenance Inspections (as defined in Subparagraph 2A(2) below). Except as otherwise provided herein, Ryder shall provide all labor and parts, as well as all other operating supplies necessary for the maintenance of the Vehicles as required hereunder. Except only as specifically described in Subparagraph 2A(9) and Paragraph 10 below, all charges, costs and expenses relating to Maintenance for each Vehicle are included in the Total Charges (as defined in Paragraph 12A below). For purposes of this Agreement, "Running Condition Standards" shall mean:

            (a)    no preventive maintenance inspection shall have been unnecessarily postponed or delayed;

            (b)    each Vehicle shall meet or exceed all applicable federal, state and local inspection requirements, including the Federal Annual Safety Inspection, and otherwise meet or exceed all federal, state and local laws, statutes, regulations and standards, including those imposed, promulgated or

enforced by the U.S. Department of Transportation (the "DOT"), and all applicable local or state authorities;

    (c)    no outstanding or unresolved post-trip driver vehicle condition reports ("DVCRs");

    (d)    tires shall have tread depth of at least 4/32" on all steer tires and 2/32" on all other tires; and

    (e)    brakes shall have at least ¼" remaining pad thickness.

    (2)    Preventive Maintenance Inspections. Ryder shall provide preventive maintenance inspections on each Vehicle as and when required by Vehicle specifications, manufacturer recommendations, governmental regulations and/or federal, state or local law ("Preventive Maintenance Inspections"). Preventive Maintenance Inspections shall be completed by Ryder in a timely manner and, as part thereof, any required repairs identified with respect to the Vehicles shall be repaired or resolved by Ryder in a time and manner consistent with good maintenance practice. Customer agrees to make each Vehicle available for scheduled maintenance of such Vehicle for a minimum of 8 hours each month at such scheduled times so as not to interfere with the normal operations of Customer's fleet. The cost of all Preventive Maintenance Inspections for each Vehicle is included in the Total Charges. The term "Ryder Service Location" shall mean a vehicle maintenance facility owned and operated by Ryder. The term "Customer Vehicle Domicile" shall mean the Customer's location where the Vehicle is parked overnight on a regular basis, as determined by the Customer. The Customer Vehicle Domicile and the corresponding Ryder Service Location are listed on Schedule E for each Vehicle. The foregoing shall not limit Ryder's ability to provide or Customer's ability to request Services at any Ryder owned facility that facilitates the provision of such Services in a commercially economic and timely manner.

    (3)    Emergency Road Service. Ryder shall coordinate and provide emergency road service related to mechanical problems or tire failure (unless it results from driver abuse, from Customer's violation of this Agreement or from physical damage not resulting from Ryder's violation of this Agreement) for all Vehicles, including but not limited to towing services ("Covered Road Services"). All charges, costs and expenses relating to Covered Road Services for each Vehicle are included in the Total Charges. In addition, Ryder shall coordinate and provide all emergency road services for the Vehicles that are not included in Covered Road Service, including but not limited to towing services, as part of Additional Services (as defined in Subparagraph 2A(9) below). Ryder may perform the services or may utilize a Third Party Vendor (as defined in Subparagraph 2A(12) below) to attend to Customer's emergency road service needs. Ryder shall either: (a) direct the Third Party Vendor to bill Customer directly for such Additional Services; or (b) shall bill Customer for such Additional Services in accordance with Subparagraph 2A(9) hereof.

    (4)    Transporting Vehicles. If any Third Party Vendor is utilized in the performance of the Services (excluding Additional Services as defined in Paragraph 2A(9) below), Ryder will either transport each affected Vehicle to the Third Party Vendor or have such Third Party Vendor pick the Vehicle up from and return it to the Customer Vehicle Domicile or the Ryder Service Location ("Transport Service"). All charges, costs and expenses relating to Transport Service for each Vehicle are included in the Total Charges.

    (5)    Fueling. Upon Customer's request, Ryder shall provide Fueling Service(s) (defined below) at any Ryder Service Location having operating fueling facilities. For purposes of this Agreement, "Fueling Service(s)" means all labor required to properly fuel all Vehicles (including, without limitation, all refrigeration units) and check all fluid levels and tire pressure. All labor costs related to

Fueling Services are included in the Total Charges (excluding the cost of fuel). Pricing for fuel shall be at rates and charges set forth in Paragraph 5A below.

(6) Washing. When Ryder is responsible for washing Vehicles pursuant to Schedule E and Customer requests such services, Ryder shall wash Vehicles ("Washing Service") at the Ryder Service Location with washing facilities closest to the applicable Customer Vehicle Domicile. If Customer desires Washing Service, Customer shall be responsible for delivering the Vehicles to the applicable Ryder Service Location. All charges, costs and expenses relating to Washing Service for each such Vehicle are included in the Total Charges.

(7) Authorized Repairs. Customer agrees that only Ryder or parties authorized by Ryder shall perform maintenance or make repairs or adjustments to the Vehicles, except where necessary on an emergency basis in order for Customer to continue normal operations. This Subparagraph 2A(7) shall apply only to maintenance, repairs or adjustments that are included in the Services (other than Additional Services as defined in Subparagraph 2A(9) below). In addition to the foregoing provisions of this Subparagraph 2A(7):

(a) Ryder agrees to obtain Customer's consent prior to commencing the performance of Services or Additional Services where Ryder reasonably estimates the related cost will exceed $1,000.00; and

(b) Customer agrees in all cases where emergency maintenance, repairs or adjustments ("Emergency Services") to Vehicles are necessary, to notify Ryder by the speediest means of communication reasonably available, describing the nature of the problem if possible, and the location of the Vehicles, and to comply with Ryder's reasonable instructions concerning Emergency Services. All related charges will be billed to Customer in accordance with Paragraph 12B. If Ryder has been notified of the need for Emergency Services and fails to Initiate such service within 45 minutes of notification, or otherwise fails to handle the Emergency Services in a commercially reasonable manner and timeframe under the circumstances, then Customer may, at its option, contract with a third party provider to provide the required Emergency Services. "Initiate" will mean that Ryder has either arranged for, or dispatched, a repair agent.

(8) Parts, Labor, Equipment and Tools. Ryder shall provide all parts, labor, equipment and tools which are necessary for the proper and efficient completion of all Services as required hereunder, including but not limited to any Services Ryder performs on-site at any Customer Vehicle Domicile as described in Subparagraph 2A(14) below. Except only as specifically described in Subparagraph 2A(9) below, all charges, costs and expenses relating to parts, labor, equipment and tools are included in the Total Charges. Except as otherwise agreed by the parties, Ryder agrees that all parts will be new or rebuilt to manufacturer's specifications and that no used parts will be used without Customer's consent. Without limiting Customer's entitlement to warranty claims as provided for in Paragraph 11 below, parts removed from Vehicles will become the property of Ryder. Ryder will not be obligated to repair or replace any detachable accessory equipment including but not limited to flares, fuses, fire extinguishers, ropes, tarpaulins or tire chains. Notwithstanding any other provision herein contained, if Ryder fails to provide any Services described in this Agreement within 5 calendar days after receiving written notice from Customer describing such failure with reasonable particularity if such Services can reasonably be performed within 5 days (or if such Services cannot reasonably be performed within 5 days, then if Ryder fails to commence such Services within 5 days and to thereafter diligently pursue them to completion), then in addition to any other remedies available to Customer at law, in equity or otherwise, (a) Customer may, at its option and upon notice to Ryder, contract with outside vendors to provide such Services, and (b) the reasonable cost of such Services shall be paid by Ryder (or credited against charges due from Customer

hereunder) within 30 days after its receipt of an invoice relating thereto and reasonable documentation of the circumstances giving rise to Ryder's liability for such charges.

(9)     Other Vehicle Related Services.  Repair and other services not described above and not reasonably considered to constitute Maintenance, Preventive Maintenance Inspections, Covered Road Services, Transport Service, Fueling Service or Washing Service shall be provided by Ryder upon Customer's request (collectively, "Additional Services") and shall be billed to Customer in addition to the Total Charges as follows:

(a)     The charge for Additional Services performed by Ryder shall be billed on a sales and service basis.

(b)     The labor rate for Additional Services performed by Ryder shall be 200% of Ryder's Internal Hourly Charge-out Rate for Labor (as defined below) at the Ryder Service Location performing the services.  Parts utilized for Additional Services shall be at Ryder's cost plus 10% (with a maximum mark-up of $100 on any individual part).  For purposes of this Agreement, "Ryder's Internal Hourly Charge-out Rate for Labor" for a Ryder Service Location shall mean the average Cost (defined below) to Ryder of all technicians (including any supervisor that performs vehicle maintenance or repair work and any "technician in charge") employed at that Ryder Service Location as of the date the Additional Services are performed.  Ryder's Internal Hourly Charge-out Rate for Labor shall be calculated quarterly, as of the last day of the quarter, unless Ryder reasonably deems a recalculation necessary for that particular Ryder Service Location before the end of the quarter due to a specific occurrence or event.  For purposes of this Subparagraph 2A(9)(b), "Cost" shall mean all wages, benefits and all applicable taxes.  "Cost" shall also include the cost of a uniform.  Wages for hourly employees shall not include overtime.  Wages for salaried employees shall be converted to hourly by dividing their yearly salary (as of the date of the calculation) by 2080 hours.

(c)     Any Additional Services performed by a Third Party Vendor shall be invoiced to Customer at Ryder's cost without overhead or mark-up, plus any applicable sales tax.  In addition, Customer shall pay Ryder an administrative fee equal to 10% of the amount of the total invoiced cost for each instance of Additional Services performed by a Third Party Vendor (up to a maximum of $100 per instance).  Subject to the foregoing, Additional Services to be provided by a Third Party Vendor and charged to Customer shall be limited to: (i) physical damage work not resulting from Ryder's violation of this Agreement, (ii) work that Ryder reasonably determines should not be performed at the applicable Ryder Service Location, and (iii) where the parties have mutually agreed that the level of work for Additional Services adversely impacts Ryder's ability to meet the Performance Standards.

(d)     Without limiting the generality of this Subparagraph 2A(9), the following shall also constitute Additional Services for purposes of this Agreement: (i) maintenance or repair services required by Customer for vehicles not covered by this Agreement (which shall be performed only upon mutual agreement of the parties), (ii) services necessitated due to changes in the law regarding vehicle maintenance, repair, replacement or retrofitting, or (iii) services necessitated due to vandalism, theft, accident not resulting from Ryder's violation of this Agreement, severe acts of nature or pursuant to Paragraph 10 hereof.

(10)     Reports.  Ryder shall provide to Customer such reports and at such times as the parties shall mutually agree upon, including without limitation Performance Standards compliance reports, breakdown reports and out of service reports.

(11)     Compliance with Laws.  Ryder shall comply with all applicable federal, state and local laws, rules and regulations relating to its performance hereunder.  Without limiting the generality of

the foregoing, Ryder shall, at its expense and at all times during the term of this Agreement (a) obtain and maintain all permits, licenses, certifications and approvals required for Ryder's performance hereunder, (b) comply with all federal, state and local laws, rules and regulations regarding safety and environmental matters pertaining to Ryder's performance hereunder, including but not limited to those relating to the proper possession, storage and use of, as well as the lawful disposal of Hazardous Materials (as hereinafter defined) including but not limited to batteries, filters, waste oil and cleaning solvents as well as the recovery of freon, and (c) neither cause or permit Hazardous Materials to be brought upon, kept or used in or about any Customer Vehicle Domicile by Ryder, its agents, employees, subcontractors or invitees at levels greater than those allowed by applicable federal, state or local laws, rules or regulations. Ryder's obligation shall include, as applicable, performing or arranging for the performance of any inspections, tests, audits or monitoring required for compliance, as well as all necessary curative action. For purposes of this Agreement, the term "**Hazardous Materials**" shall mean and include all toxic or hazardous substances, pollutants, waste or contaminants to which liability or standards of conduct may be imposed under any federal, state or local law, rule or regulation relating to safety and environmental matters including, without limitation, (i) petroleum or petroleum based products or any derivatives or hazardous constituents thereof or any additives thereto, (ii) fuels (including motor fuels, diesel, methane and other natural gas), (iii) waste oils, lubricating oils and cleaning solvents, (iv) ammonia, glycol and freon, or (v) other substances (including, but not limited to, any "Hazardous Substances", "Hazardous Materials", "Regulated Substances" or "Toxic Substances", or similarly defined terms, as set forth in any federal, state or local law, rule or regulation.

(12)     Ryder Expertise. Ryder represents, warrants and covenants to Customer that (a) all Services shall be performed in a good, skillful, efficient and workman-like manner and otherwise in material compliance with all the provisions set forth in this Agreement, and (b) Ryder has the experience and expertise to cause all Services to be performed in accordance with this Agreement and the Performance Standards. Ryder acknowledges that such representations, warranties and covenants constitute material and essential inducements to Customer to enter into this Agreement. Subject to all limitations and restrictions set forth elsewhere in this Agreement (including but not limited to the representations, warranties and covenants set forth above in this Subparagraph 2A(12)), Ryder may hire a third party vendor (each a "**Third Party Vendor**") to perform portions of the Services; provided, however, that in each instance such Third Party Vendor shall be deemed to be a subcontractor of Ryder and not of Customer.

(13)     Exceptions.  Maintenance shall not include, and Customer will be solely responsible for, maintenance, repair or replacement of any non-mechanical components of each Vehicle. The foregoing shall apply, without limitation to all non-mechanical parts of the cab, chassis, body, main rails, cross members, side posts, outer sheet metal, roof and roof bows, floors, FRP panels, doors, and frame assembly.  Any work or repairs described in this Subparagraph 2A(13) performed by Ryder shall be considered Additional Services. Notwithstanding the foregoing, to the extent any maintenance, repair or replacement described in this Subparagraph 2A(13) are required as a result of the negligence or willful misconduct of Ryder (or its employees, agents, subcontractor's or invitees) or Ryder's violation of this Agreement, Ryder shall perform such maintenance, repairs or replacement at no additional cost to Customer.

(14)     On-site Maintenance.

(a)     Ryder may perform Preventative Maintenance Inspections and certain Maintenance functions, as reasonably determined by Ryder and subject to mutual agreement by the parties, on-site at the applicable Customer Vehicle Domicile ("**On-site Maintenance**"). Ryder shall provide for the shuttling of Vehicles between the Customer Vehicle Domicile and the Ryder Service Location as required for the performance of Maintenance and Preventative Maintenance Inspections performed at the Ryder Service Location. The cost of such shuttling services shall be included in the Total Charges.

(b)     In connection with the performance of On-site Maintenance, Ryder agrees to use due diligence in the care and protection of the Customer Vehicle Domicile. Additionally, Ryder shall be responsible for repairing and cleaning up any damage to the Customer Vehicle Domicile as a result of the use, occupancy or presence of Ryder, or its employees, agents, subcontractors or invitees at any Customer Vehicle Domicile or as the result of the performance of On-site Maintenance.

B.     Maintenance Technicians. Ryder shall provide adequate personnel trained and certified to work on the Vehicles and shall cause such personnel to perform all Services as required hereunder. As between Ryder and Customer, Ryder shall be responsible for any and all costs associated with the employment of such personnel including, as applicable and without limitation, all wages, expenses, benefits, vacation pay, unemployment insurance, workers' compensation insurance and collection and payment of all applicable taxes and employer required contributions. Ryder shall have ongoing safety programs and employee training as to safety guidelines standard to the industry and as required by law. Ryder shall ensure that Ryder employees present themselves in a professional manner, with clean uniforms identifying themselves as Ryder employees. Ryder shall require that all employees performing Services at any Customer Vehicle Domicile comply with Customer's safety regulations and general rules and policies in place with regard to such facility as provided in writing to Ryder or as instructed by Customer at such facility. Upon Customer's written request with reasonable particularity, and so long as such removal is not prohibited by law, Ryder shall remove any person from providing Services hereunder. Thereafter, Ryder shall not allow such person to provide any of the Services hereunder without Customer's prior written consent, which consent may be withheld at Customer's sole discretion.

3.     [Intentionally omitted.]

4.     [Intentionally omitted.]

5.     **FUEL; FUEL TAX REPORTING**

A.     Fuel. At Customer's option, and as provided for in Subparagraph 2A(5), Ryder will provide fuel (of a grade recommended by the manufacturer of the Vehicles) to Customer from Ryder Service Locations having operational fueling facilities. The per gallon charge for the fuel shall vary over time and shall be billed in addition to the Total Charges, but shall not exceed the Oil Price Information Service ("OPIS") Wholesale Average Cost of Fuel (as of the date of purchase) for the locality where the fuel is purchased (or the closest location or terminal for which OPIS publishes an index) plus (i) two cents per gallon ($.02/gallon), (ii) all applicable taxes, (iii) freight costs, and (iv) the cost of necessary fuel additives. If Customer obtains fuel from sources other than Ryder Service Locations, Customer will be responsible for all charges for such fuel.

B.     Fuel Tax Reporting. Customer will be responsible for obtaining fuel tax permits, preparing and filing fuel and mileage tax returns, and remitting taxes imposed upon the purchase and consumption of fuel by Customer with respect to the Vehicles. Customer will hold Ryder harmless from any claims, losses, damages and expenses resulting from Customer's failure to report or pay fuel taxes with respect to the Vehicles.

6.     **SUBSTITUTE VEHICLES.**

Ryder will not be required to provide substitute vehicles for any inoperable Vehicle, regardless of the cause of such inoperability (except where such inoperability results from an accident or collision caused by the negligence or willful misconduct of Ryder or its employees, agents, subcontractors or invitees or by Ryder's violation of this Agreement, in which case, upon Customer's request, Ryder will furnish a comparable

substitute vehicle at no additional cost to Customer). Where Ryder is not obligated to furnish a substitute vehicle in accordance with the foregoing, Ryder will rent Customer replacement vehicles at a rate not to exceed Ryder's National Tier One Rental Rates, at Customer's request and subject to availability.

7.    **LICENSES; TAXES**

A.    Customer will be responsible for obtaining any and all required state motor vehicle licenses with respect to the Vehicles.

B.    Customer will pay all taxes (whether in effect now or imposed after the date of this Agreement) relating to any Vehicle or to the lease, rental or other charges under this Agreement (excluding any taxes based on Ryder's net income). Customer, however, will be entitled to any refunds that may be subsequently issued with respect to the above taxes, and Ryder agrees to provide Customer reasonable assistance in obtaining such refunds.

8.    **INDEMNIFICATION**

A.    Agreement to Indemnify by Customer. Subject to the limitation of liability set forth in Paragraph18 hereof, Customer agrees to protect, indemnify, release, defend and hold Ryder and its officers, members, employees, successors, assigns and affiliates harmless from, and reimburse each such party for, any claims, suits, damages, liabilities, expenses or other legal or financial exposure (collectively, "Losses") (unless and to the extent such Losses are caused by the negligent acts or omissions or willful misconduct of Ryder, its employees, agents, subcontractors or invitees) arising from (1) the ownership, use, operation or maintenance (by any person other than Ryder, its employees, agents or subcontractors) of the Vehicles, or (2) a breach by Customer of any of its representations, warranties, covenants, duties or obligations under this Agreement. This indemnity will survive the expiration or termination of this Agreement.

B.    Agreement to Indemnify by Ryder. Subject to the limitation of liability set forth in Paragraph18 hereof, Ryder agrees to protect, indemnify, release, defend and hold Customer and its officers, members, employees, successors, assigns and affiliates harmless from, and reimburse each such party for, any Losses (unless and to the extent such Losses are caused by the negligent acts or omissions or willful misconduct of Customer, its employees, agents subcontractors or invitees) arising from (1) negligence or willful misconduct in the performance by Ryder (or its employees, agents or subcontractors) of any of Ryder's duties or obligations under this Agreement, (2) a breach by Ryder of any of its representations, warranties, covenants, duties or obligations under this Agreement, (3) the negligent use or operation of any Vehicle by Ryder, or its employees, agents or subcontractors; (4) the use, occupancy or presence of Ryder, or its employees, agents, subcontractors or invitees at any Customer Vehicle Domicile; or (5) unless and to the extent caused by the negligent acts or omissions or willful misconduct of Customer, its employees, agents, subcontractors or invitees, any claims or actions initiated by Ryder's employees or agents and pertaining in any way to the course or scope of their employment. This indemnity will survive the expiration or termination of this Agreement.

C.    Environmental Indemnity by Customer. Subject to the limitation of liability set forth in Paragraph18 hereof, and except to the extent covered by any indemnification obligations of Ryder contained in this Agreement, Customer also agrees to protect, indemnify, release, defend and hold Ryder and its officers, members, employees, successors, assigns and affiliates harmless from, and reimburse each such party for, any Losses, arising during the term of this Agreement or thereafter and of any kind or nature whatsoever, and resulting from or arising in connection with the presence (or suspected presence), disposal, release (or threatened release), of any Hazardous Material in, on, from or affecting any Customer Vehicle Domicile. Without limiting the generality of the foregoing, Customer's indemnification shall apply to Losses resulting from or arising out of (i) investigations, cleanups, removals, or restorations of the

Customer Vehicle Domicile required by any federal, state or local agency or political subdivision, personal injuries (including wrongful death), and property damage (real and personal) and (ii) Hazardous Materials which flow, diffuse, migrate or percolate into, onto or under the Customer Vehicle Domicile. The foregoing indemnity shall survive the expiration or termination of this Agreement for any reason.

      **D.**    Environmental Indemnity by Ryder. Subject to the limitation of liability set forth in Paragraph 18 hereof, and except to the extent covered by any indemnification obligations of Customer contained in this Agreement, Ryder also agrees to protect, indemnify, release, defend and hold Customer and its officers, members, employees, successors, assigns and affiliates harmless from, and reimburse each such party for, any Losses arising during the term of this Agreement or thereafter and of any kind or nature whatsoever, and resulting from or arising in connection with the presence (or suspected presence), disposal, release (or threatened release), of any Hazardous Materials in, on, from or affecting any Customer Vehicle Domicile, to the extent caused by (i) the acts or omissions of Ryder, its agents, employees, contractors or invitees, (ii) the breach of any obligation, covenant, representation or warranty of Ryder contained in this Agreement, (iii) the use, occupancy or presence of Ryder, or its employees, agents, subcontractors or invitees at any Customer Vehicle Domicile or the performance of Ryder's obligations under this Agreement. Without limiting the generality of the foregoing, Ryder's indemnification shall apply to Losses resulting from or arising out of (a) investigations, cleanups, removals, or restorations of the Customer Vehicle Domicile required by any federal, state or local agency or political subdivision, personal injuries (including wrongful death), and property damage (real and personal) and (b) Hazardous Materials which flow, diffuse, migrate or percolate into, onto or under the Customer Vehicle Domicile. This indemnity will survive the expiration or termination of this Agreement.

      **E.**    Loss or Damage to Vehicles or Substitute Vehicles. To the extent that Ryder is liable to Customer for any loss or damage to a Vehicle, Ryder's liability to Customer for such loss or damage will be limited to the fair market value for the Vehicle as of the date of the loss or damage. During the period that any substitute vehicle provided by Ryder to Customer (as described in Paragraph 6 above) is in the care, custody and control of Customer, Customer will be responsible for any and all loss (including theft) or damage to such substitute vehicle, except to the extent such damage was caused by Ryder's negligent acts or omissions or willful misconduct or that of its employees, agents or subcontractors. To the extent that Customer is liable to Ryder for any loss or damage to a substitute vehicle, Customer's liability to Ryder for such loss or damage will be limited to the fair market value for the substitute vehicle as of the date of the loss or damage.

      **F.**    Loss or Damage to Cargo. Ryder will have no liability for loss of or damage to any goods or other property in or carried on any Vehicle or substitute vehicle.

## 9.    DRIVERS

All Vehicles shall be operated only by legally qualified drivers, who shall have all required licenses. With the exception of Transport Service described in Subparagraph 2.A(4) above, drivers shall be subject to Customer's exclusive direction and control. Customer and Ryder (when providing Transport Service) shall use commercially reasonable efforts to require drivers to operate the Vehicles with reasonable care and diligence and in compliance with all applicable laws, rules and regulations.

## 10.    OPERATION OF VEHICLES

The Vehicles will be used and operated by Customer only in the normal and ordinary course of Customer's business. Customer will not use any Vehicle to transport cargo, property, or hazardous material in a quantity that requires placarding by the DOT or any medical, bio-hazardous, or radioactive waste. Ryder will not be responsible for maintenance, repairs or other Services resulting from reckless, careless or abusive handling

of the Vehicles (which includes, but is not limited to, any act or omission which deviates from reasonable treatment or loading of Vehicles, including exceeding the manufacturer's maximum gross vehicle weight ("GVW") or combined gross vehicle weight ("CGVW") by any person other than Ryder, its employees, agents or subcontractors. In the event that the Vehicles require maintenance, repairs or other Services due to reckless, careless or abusive handling as above described, Ryder will provide Customer with appropriate documentation evidencing such reckless, careless or abusive handling and, upon written approval of such documentation by Customer (including a request by Customer that Ryder perform the required Services), Ryder shall perform the required Services. Such Services shall be considered Additional Services and Customer will be responsible for the charges for the Additional Services pursuant to Subparagraph 2A(9) above.

## 11. WARRANTY CLAIMS

Customer agrees to assist Ryder in documenting, completing and collecting on any and all warranty claims on the Vehicles. Customer agrees to furnish to Ryder all warranties applicable to the Vehicles and to assist Ryder in obtaining the benefits of such warranties. Customer will be entitled to receive and retain all monies paid to Ryder on any warranty claim for which Ryder performed (or caused to be performed by a Third Party Vendor) the maintenance or repairs to which the monies relate. Warranty recovery monies received by Customer for maintenance or repairs shall be retained by Customer or, if received by Ryder, credited against the Total Charges. Customer understands the timing of such warranty recovery credits may not correspond with the timing of the billing for the related maintenance or repairs included in the Total Charges. Customer agrees to execute any reasonable documents for Ryder necessary to carry out the intent of this Paragraph 11.

## 12. CHARGES; PAYMENT

A. **Charges and Invoices.** Customer agrees to pay Ryder (1) the Fixed Charge per month for each Vehicle, as indicated on Schedule E ("Fixed Charges"), in advance, pro-rated for portions of a month, and (2) all Actual Maintenance Costs for each Vehicle (as defined below in Paragraph 12B), in arrears within 30 days of the date of Ryder's invoice. For purposes of this Agreement, the Fixed Charge and Actual Maintenance Costs are collectively called, the "Total Charges" Ryder shall invoice Customer monthly in arrears for charges relating to Additional Services and all other charges not addressed in this Paragraph 12A, and Customer shall pay all such charges within 30 days of the date of Ryder's invoice. Ryder and Customer agree that invoices from Ryder shall not include and that Customer shall not be responsible for Actual Maintenance Costs incurred with respect to Services performed more than 90 days prior to the date of such invoice (unless such Actual Maintenance Costs relate to Services performed by a Third Party Vendor in which case the provisions of Paragraph 12C below will control). Customer shall pay all invoices without deduction or setoff, except to the extent a particular item is incorrect and then only if Customer gives Ryder notice of the error before payment is due and pays all amounts not then in dispute. The Total Charges for a Vehicle shall not be subject to adjustment or escalation during the first 3 years of the term of this Agreement for such Vehicle except as provided in Paragraph 13 below.

B. **"Actual Maintenance Costs"** shall mean (1) all reasonable direct costs and expenses, without overhead or mark-up, incurred by Ryder in the performance of the Services for any Vehicle, including but not limited to labor billed at Ryder's Internal Hourly Charge-out Rate for Labor at the Ryder Service Location performing the applicable Services, and (2) all reasonable direct costs (including labor), without overhead or mark-up, incurred by Ryder where Ryder subcontracts the Services (including, but not limited to, Covered Road Services) to a Third Party Vendor. Billing for Labor incurred in the performance of Maintenance at a Customer Vehicle Domicile will include time spent in the performance of such Maintenance and will exclude travel time between the Customer Vehicle Domicile and the Ryder Service

Location. Actual Maintenance Costs shall not include costs or expenses incurred by Ryder in the performance of Additional Services, which shall be governed by Paragraph 2A(9).

C.    Third Party Vendor Invoices. If charges relating to Services performed by a Third Party Vendor are not invoiced to Customer within 90 days of the date such Services are completed, then Ryder shall pay Customer a late invoice penalty to be calculated as follows:

| Timing of Invoice to Customer (from the date the applicable Services are completed by a Third Party Vendor) | Late Invoice Penalty (total percentage of the amount of the Third Party Vendor charges at issue) |
|---|---|
| Over 90 days | 10% |
| Over 120 days | 15% |
| Over 180 days | 25% |

This penalty shall not apply to services that were requested by Customer directly from a third party without Ryder's participation or knowledge. Any late invoice penalty due pursuant to this provision shall be credited against the Total Charges.

D.    Mileage. Mileage will be determined from odometer or hubometer readings. Hours will be determined from hour meter readings. If the odometer, hubometer, or hour meter fails to function, which failure Customer will report to Ryder, the miles or hours operated during the period of failure may be determined upon mutual agreement of the parties from (1) Customer's trip records, or (2) the amount of fuel consumed and the average miles per gallon and/or hours per gallon for the previous 30 days, according to Customer's records.

E.    Access to Books and Records. Upon reasonable notice, and at Customer's sole cost, Customer, its representatives and/or auditors shall have access to the relevant portions of all pertinent books, records, invoices and other documentation of Ryder to verify the work performed and the amounts invoiced pursuant to this Agreement.

## 13.    ADJUSTMENT AND ABATEMENT OF CHARGES

A.    CPI Index Adjustment. The parties recognize that the Fixed Charges (as defined in Paragraph 12A) are based on Ryder's current cost of facilities, labor, parts and supplies which will fluctuate over time. Customer agrees that for each rise or fall of one percent (1%) in the Revised Consumer Price Index For Urban Wage Earners and Clerical Workers (using a 1967 base period), published by the United States Bureau of Labor Statistics ("CPI Index"), above or below the "Base Index", as defined below, the amount of the Fixed Charges for each Vehicle will be adjusted upward or downward by one percent (1%); provided, however, any and all adjustments in charges for the Vehicles will be based on the original Fixed Charges as stated on Schedule E. Each adjustment will be effective on January 1 and will be based on the latest CPI index which has been published prior to the effective date of such adjustment. No annual adjustment shall increase the Fixed Charges by more than 2% of the original amount of the Fixed Charges as stated on Schedule E. The "Base Index" shall be determined as follows: (1) for each Vehicle having a Beginning of Term date between January 1 and June 30 (inclusive) of any given calendar year, the Base Index shall be the CPI Index as of January 1 of such calendar year, and (2) for each Vehicle having a Beginning of Term date between July 1 and December 31 (inclusive) of any given calendar year, the Base Index shall be the CPI Index as of July 1 of such calendar year. In the event the CPI Index is discontinued, another mutually acceptable cost adjustment index will be chosen by the parties. Prior to implementation of any adjustment hereunder, Ryder shall give Customer written notice of such adjustment, which shall include supporting documentation.

B.     [Intentionally omitted.]

C.     [Intentionally omitted.]

D.     Abatement. After a Vehicle is out of service for any reason (except for damage resulting from driver abuse, upset, Customer's violation of this Agreement or collision not caused by Ryder's violation of this Agreement) for period of 2 weeks from the date that Ryder receives notice of the problem and the Vehicle is made available to Ryder for such repairs, the Fixed Charges for such out of service Vehicle shall thereafter abate until such time as it is returned to Customer in accordance with the provisions of this Agreement and ready to be placed in service; provided, however, that if such repair cannot reasonably be performed within the 2 week period due to unavailability of parts, the parties shall meet to determine a reasonable period within which Ryder will be required to perform such repairs.

14.     INSURANCE

A.     Insurance Required of Customer. Customer will maintain, in full force and effect and at its sole cost and expense, a standard policy of automobile liability insurance ("Liability Insurance") with a limit per occurrence of no less than $1,000,000 covering the Vehicles and any substitute vehicle provided by Ryder, written by a company or companies ("Insurer") reasonably satisfactory to Ryder and will provide that coverage afforded cannot be canceled or materially altered by the Insurer or Customer without 30 days prior written notice to Ryder. Customer will deliver to Ryder, upon request, certificates evidencing compliance with the provisions of this Paragraph 14A.

B.     Insurance Required of Ryder. Ryder shall maintain, at all times during the term of this Agreement and at its sole cost and expense, the following: (1) workers' compensation insurance, at the applicable required statutory limits, and employer's liability insurance, with a limit per occurrence of $1,000,000, with respect to Ryder employees providing any services pursuant to this Agreement, (2) Garage Keepers liability insurance, with a limit per occurrence of $2,000,000 naming Customer as an additional insured as respects the performance of any Services at any Customer Vehicle Domicile, (3) Garage Keepers physical damage insurance, with a comprehensive/collision limit of $100,000, (4) comprehensive automobile liability insurance, with a limit per occurrence of $2,000,000 for bodily injury and property damage, including a duty to defend and covering all owned, non-owned and leased or hired vehicles naming Customer as an additional insured as respects Ryder's use or operation of any Vehicle or substitute vehicle, (5) commercial general liability and property damage insurance in the amount of $2,000,000 combined single limit, naming Customer as an additional insured as respects the performance of any Services at any Customer Vehicle Domicile, and (6) umbrella liability coverage with a limit per occurrence of $3,000,000 in excess of the underlying policy limits, which umbrella policy must provide coverage at least as broad as the underlying policies described above. In addition, Ryder shall maintain, at all times during the term of this Agreement and at its sole cost and expense, pollution legal liability insurance with a limit per occurrence of no less than $1,000,000 and a combined single limit of no less than $2,000,000 naming Customer as an additional insured as respects the performance of any Services at any Customer Vehicle Domicile and covering bodily injury and property damage, including a duty to defend, arising from pollutants or environmental impairment including on-site and off-site cleanup costs for both first party and third party claims, on-site and off-site bodily injury and property damage, insured acts covering on premises, off premises, completed operations, transportation and disposal sites, coverage for punitive damages, fines and penalties where allowable by law, and covering both sudden and gradual pollution conditions. The policies shall be written by an Insurer rated A- or better by A.M. Best Co. and shall provide that coverage afforded cannot be canceled or materially altered by the Insurer or Ryder without 30 days prior written notice to Customer and contain the condition that such insurance is primary to any liability insurance maintained by Customer or any of its parent companies as respects the performance of

any Services at any Customer Vehicle Domicile or as respects Ryder's use or operation of any Vehicle; provided, however, that Ryder may self-insure for the coverage described in Subparagraphs 14B(3) and 14B(4) above, as well as the pollution legal liability insurance.   Ryder will deliver to Customer, upon request, certificates evidencing compliance with the provisions of this Paragraph 14B.  If Ryder fails to maintain any of the insurance coverage required by this Paragraph 14B, Customer has the right to terminate this Agreement at any time upon 5 days' notice.  Such termination rights shall be in addition to those contained elsewhere in this Agreement.

    C.    To the extent any insurance policy provided by either party pursuant to Section 14 hereof is a "claims made" policy (rather than an "occurrence" policy), the obligations of Section 14 with respect to such policy will survive for a period of 2 years following the expiration or termination of this Agreement.

## 15.   TERM AND TERMINATION

    A.    Right to Terminate.   The term of this Agreement shall be for a period of five (5) years from the Effective Date; provided, however, that either party may terminate this Agreement in its entirety, for any reason or for no reason, at any time after the first anniversary of the Effective Date.  In order to effect termination under this Paragraph 15A: (1) Ryder shall be required to give Customer at least 120 days' prior written notice of such termination; and (2) Customer shall be required to give Ryder at least 60 days' prior written notice of such termination.

    B.    Termination as to Specific Vehicles.

        (1)    Customer shall have the right at any time, in its sole discretion, to remove a Vehicle from coverage under this Agreement upon no less than 30 days' prior written notice to Ryder.  In such event, this Agreement (and all corresponding fees relating thereto) will terminate as to such Vehicle as of the effective date of removal.  It is understood and agreed that the limited termination right set forth in this Subparagraph 15B(1) is intended to allow Customer the flexibility necessary to manage its fleet and is not intended to be a general right to terminate the Services performed by Ryder under this Agreement.

        (2)    If a Vehicle is lost or stolen and remains so for 30 days after Customer has notified Ryder, this Agreement will terminate as to such Vehicle as of the date of loss or theft.  If a Vehicle is damaged to the extent that it is economically impractical for Customer to repair, as determined by Customer in its sole discretion, this Agreement will terminate as to such Vehicle as of the date the damage occurred.

        (3)    If any Vehicle is transferred to another Customer Vehicle Domicile ("New CVD") which is serviced hereunder by another Ryder Service Location ("New RSL"), the Total Charges hereunder for such Vehicle shall be adjusted, effective as of the date of such transfer, to reflect the then-current rates and charges at the New RSL for Vehicles then in service hereunder of like age, make, model and specifications.  If there is no comparable Vehicle then in-service at the New RSL, the parties shall negotiate diligently and in good faith to reasonably determine the adjusted rates and charges for each such Vehicle.  Any such adjustment in charges shall be evidenced by a new Schedule E or other written amendment to this Agreement executed by parties.

    C.    Termination Due to Default.  Either party may terminate this Agreement upon written notice following occurrence of an Event of Default by the other party.  An "Event of Default" shall mean:

        (1)    any representation or warranty by a party is false or misleading in any material respect as of the time when made or at any time during the term of this Agreement; provided that (a) such failure continues for 20 days after receiving written notice from the other party describing such failure with

reasonable particularity, and (b) during such 20 day period, authorized representatives of the party providing such notice make themselves available to confer with the other party and negotiate diligently and in good faith to resolve any dispute or controversy relating to any such claimed failure;

(2)     the failure of a party to pay timely and in full any amounts properly due to the other party pursuant to this Agreement; provided that (a) such amounts were not withheld in accordance with Paragraph 12A, (b) such failure continues for 20 days after receiving written notice from the other party describing such failure with reasonable particularity, and (c) during such 20 day period, authorized representatives of the party providing such notice make themselves reasonably available to confer with the other party and negotiate diligently and in good faith to resolve any dispute or controversy relating to any such claimed failure;

(3)     the material breach or material failure by a party in the due observance and performance of any of the provisions of this Agreement; provided that (a) such failure continues for 20 days after receiving written notice from the other party describing such failure with reasonable particularity, and (b) during such 20 day period, authorized representatives of the party providing such notice make themselves available to confer with the other party and negotiate diligently and in good faith to resolve any dispute or controversy relating to any such claimed failure;

(4)     a party files a petition for bankruptcy or is otherwise adjudicated bankrupt; and

(5)     a petition is filed against a party for bankruptcy or seeking similar relief, and such petition is not dismissed within 90 days.

D.     [Intentionally omitted.]

E.     Condition of Vehicles.  As of the termination date for any Vehicle, Ryder agrees that the Vehicle will meet the Vehicle Condition Standards (as defined in Paragraph 16A below).

F.     [Intentionally Omitted]

G.     Attorneys' Fees.  Any party to this Agreement who is the prevailing party in any legal or equitable proceeding against any other party brought under this Agreement shall be additionally entitled to recover court costs and reasonable attorneys' fees from the non-prevailing party.

16.     VEHICLE EVALUATION AND TAKE OVER

A.     Inspection of Vehicles.  Upon the Beginning of Term for each Vehicle, Ryder shall promptly perform a complete, detailed inspection and evaluation of such Vehicle to determine if the Vehicle meets the Vehicle Condition Standards set forth on Exhibit B (the "Vehicle Condition Standards"). Following such inspection ("Inspection") of each Vehicle, Ryder will issue a written report to Customer which (a) separates the Inspection results by damage repair, safety related and mechanical, (b) substantiates any deficiencies with reasonable specificity, (c) sets forth all costs and expenses related to the performance of any and all repairs required to bring the Vehicle up to the Vehicle Condition Standards, and (d) provides reasonable back-up documentation ("Inspection Report"). Ryder shall have a period of 90 days from the Beginning of Term for each Vehicle ("Inspection Period") in which to deliver to Customer the Inspection Report for that Vehicle. If Customer fails to make any Vehicle reasonably available to Ryder prior to the end of the Inspection Period ("Unavailable Vehicles"), then Ryder shall notify Customer in writing within thirty (30) days of the end of the Inspection Period ("Unavailability Notice"). Within seven (7) days of receiving Ryder's Unavailability Notice, Customer shall make the Unavailable Vehicles reasonably available to Ryder for Inspection. Ryder shall have thirty (30) days from the time that the

Unavailable Vehicles are made available to Ryder to complete its Inspection of such Unavailable Vehicles ("**Extended Inspection Period**"). In the event Ryder fails to provide Customer with the Inspection Report within the Inspection Period or the Extended Inspection Period, Ryder shall be responsible for the performance of any and all repairs required to bring the Vehicle up to the Vehicle Condition Standards, as well as all costs and expenses related thereto. For purposes of this Agreement, "**Beginning of Term**" for each Vehicle shall mean (y) for each Vehicle described on a **Schedule E** attached to this Agreement, the Beginning of Term shall be April 1, 2008, and (z) for each Vehicle added to coverage hereunder during the term of this Agreement, the Beginning of Term shall be the date on which the parties execute the applicable Schedule E. **THE PARTIES AGREE THAT PURSUANT TO THE PROCESS OUTLINED IN THIS SUBPARAGRAPH 16A, RYDER WILL HAVE A FULL AND COMPLETE OPPORTUNITY TO INSPECT THE VEHICLES (INCLUDING UNAVAILABLE VEHICLES) AND CUSTOMER MAKES NO, AND HEREBY DISCLAIMS ANY AND ALL, REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE CONDITION OF THE VEHICLES.**

B.     Repairs. If an Inspection Report provided to Customer within the applicable Inspection Period reveals that the costs and expenses related to the performance of any and all repairs required to bring the Vehicle up to the Vehicle Condition Standards ("**Inspection Repairs**") will exceed the amount of $1,000, Ryder will contact Customer for authorization to perform the Inspection Repairs. Ryder will not be obligated to obtain from Customer any authorization to perform Inspection Repairs for any Vehicle that does not exceed such $1,000 limit. If Ryder performs the repairs identified in the Inspection Report (with the authorization of Customer, as required) on any Vehicle, such repairs shall be performed so that, when completed, the Vehicle meets or exceeds the Vehicle Condition Standards. The repairs performed by Ryder pursuant to this Paragraph 16B shall be billed to Customer pursuant to Paragraph 12B. If Customer determines (in its sole discretion) not to have the Inspection Repairs made to any Vehicle, then the Vehicle shall be returned to Customer without further work being performed on it by Ryder and the Vehicle will be deleted from Schedule E and this Agreement shall be terminated as to such Vehicle effective as of the date that Customer notifies Ryder of its determination not to have such repairs made.

C.     Deadline. All Inspection Repairs will be performed by Ryder within a reasonable period of time, not to exceed 90 days from the date of the Inspection Report or receipt of Customer's consent, if required. Notwithstanding the foregoing or any other provision contained in this Agreement, it is specifically understood and agreed that, with respect to all Ryder's obligations and services to be provided pursuant to this Paragraph 16 including but not limited to the performance of any and all inspections and repairs and the use and possession of the Vehicles in connection therewith (collectively, the "**Takeover Services**"), (1) all provisions of this Agreement shall apply to the performance of the Takeover Services, and (2) the Takeover Services shall be deemed to constitute Services hereunder

D.     [Intentionally omitted.]

E.     Additional Vehicles. Used Vehicles to be added to coverage under this Agreement after the Effective Date shall be subject to the inspection and repair procedures set forth in this Paragraph 16.

F.     New Vehicles. Vehicles that are placed in service hereunder as new shall not be subject to the inspection and repair procedures set forth in this Paragraph 16.

17.    **FORCE MAJEURE**

In the event a party is prevented from performing any of its obligations under this Agreement by circumstances beyond its control, including without limitation, national emergency, wars, terrorism, riots, fires, labor disputes, Federal, state or local laws, rules or regulations, shortages (local or national), or fuel allocation programs (each, a "Force Majeure Event"), such party's obligations shall be temporarily suspended; provided, that in the event of a Force Majeure Event affecting Ryder, Ryder shall continue to perform under this Agreement to the extent commercially reasonable and shall use its best efforts to resume performance hereunder as quickly as possible. A party affected by a Force Majeure Event shall give written notice to the other party of the occurrence of a Force Majeure Event as soon as commercially practicable.

18.    **LIMITATION OF LIABILITY.**

NOTWITHSTANDING ANY OTHER PROVISION SET FORTH IN THIS AGREEMENT, IN NO EVENT (INCLUDING, WITHOUT LIMITATION, ANY TERMINATION OF THIS AGREEMENT WITH OR WITHOUT CAUSE) WILL EITHER PARTY BE LIABLE TO THE OTHER FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, LOST PROFITS) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR EITHER PARTY'S PERFORMANCE UNDER THIS AGREEMENT.

19.    **GENERAL**

    A.    Notices. Unless specifically provided herein, all notices under this Agreement must be in writing and must be sent by nationally recognized overnight courier or registered or certified United States mail, return receipt requested, addressed to the parties at the addresses set forth below (or at the most recent such address delivered by the intended recipient in any of the methods set forth above), and shall be considered to be effective upon receipt:

|  |  |
|---|---|
| If to Ryder: | Ryder Truck Rental, Inc.<br>11690 NW 105 Street<br>Miami, FL 33178-1103<br>Attn: General Counsel<br>Telephone: 305.500.7797 |
| If to Customer: | Midwest Ice Cream Company, LLC<br>Attn: Distribution Manager<br>1253 Kingsland Drive<br>Batavia, IL 60510<br>Telephone: 630.879.0800 |
| With copy to: | Dean Foods Company<br>Attn: General Counsel<br>2515 McKinney Avenue, Suite 1200<br>Dallas, TX 75201<br>Telephone: (214) 303-3400 |

    B.    Assignment. This Agreement is for the benefit of and shall be binding upon Customer and Ryder and each of their respective successors and permitted assigns. Customer agrees not to assign its interest under this Agreement without the prior written consent of Ryder, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, no such consent from Ryder shall be required for any assignment to Customer's direct or indirect subsidiaries or affiliated entities (each an "Affiliate"),

including, but not limited to, Dean Transportation, Inc.; provided, however, that if Ryder reasonably objects to an Affiliate to which Customer proposes to assign this Agreement, then such assignment shall be effective only upon written agreement by Dean Transportation, Inc., in a form reasonably acceptable to all parties, to guaranty the obligations of such assignee hereunder. Ryder shall not assign this Agreement or any of its rights or obligations hereunder or any of its interest herein (by contract, operation of law or otherwise) without the prior written consent of Customer.

C.        Entire Agreement.   This Agreement, including all exhibits and schedules attached hereto, and any other exhibit, schedule or addendum hereto executed by Ryder and Customer, constitutes the final agreement between the parties.  It is the complete and exclusive expression of the parties' agreement on the matters contained in this Agreement.  All prior and contemporaneous negotiations and agreements between the parties on matters contained in this Agreement are expressly merged into and superseded by this Agreement.  In entering into this Agreement, neither party has relied upon any statement, representation, warranty, or agreement of the other party except for those expressly contained in this Agreement.

D.        Amendments.   Except as otherwise provided elsewhere herein, this Agreement may not be amended, supplemented or modified, nor any rights hereunder waived, in any respect without further written agreement of both parties signed by their respective authorized representatives.

E.        Governing Law.   This Agreement shall be governed by the law of the State of Illinois, without regard to conflict of laws principles.

F.        Relationship of Parties.   Each party hereby acknowledges and agrees that (1) it is an independent contractor and not an employee, agent or representative of the other party, and (2) it is not authorized to assume or create any obligation or responsibility on behalf of the other party.  Neither party, nor any of its employees, agents or representatives, shall misrepresent its status or authority.

G.        No Waiver; Remedies Cumulative.   No delay or omission by either party in exercising any right or power hereunder will impair such right or power or be construed as a waiver thereof.  Except as otherwise provided herein, all remedies provided for in this Agreement will be cumulative and in addition to, and not in lieu of, any other remedies available to either party at law, in equity or otherwise.

H.        No Release; Survival of Obligations.   No expiration or termination of this Agreement shall release either party from any obligation accrued prior to the date of such expiration or termination or from any obligations surviving the expiration or termination of this Agreement.  Any and all rights and obligations under this Agreement which by their nature should survive will remain in effect after termination or expiration hereof. Without limiting the generality of the foregoing, it is specifically acknowledged and agreed that the provisions contained in each of the following Paragraphs shall survive the expiration or termination of this Agreement 8, 14C, 18 and 19.

I.        [Intentionally omitted.]

J.        Counterparts; Facsimile Signatures.   This Agreement may be executed in one or more counterparts for the convenience of the parties hereto, all of which together will constitute one and same instrument.  A facsimile signature shall have the same force and effect as an original signature.

K.        Construction.   This Agreement has been negotiated by the parties hereto, and shall be fairly interpreted in accordance with its terms and without strict construction in favor of or against any of the parties.  The headings contained herein are for convenience of reference only and shall not be deemed to limit or affect the subject matter contained herein.

IN WITNESS WHEREOF, each of the undersigned parties has executed this Agreement by its authorized representative to be effective as of the Effective Date.

**RYDER TRUCK RENTAL, INC.**                    **MIDWEST ICE CREAM COMPANY, LLC**

(RYDER)                                          (CUSTOMER)

By: _____                            By: _____
Name/Title: _____ Rick Cibos                   Name/Title: _____
        Dir National Accounts                Michael L. Ahart
                                          Vice President

I:\KON (Contracts M-R)\Ryder Truck Rental Inc\RPM Batavia, Illinois (3-26-08).doc

Exhibit A

Performance Standards

Preventive Maintenance Inspections (PMI) Currency Standard: 94% of PMIs shall be completed within 2,000 miles or 20 days of its due date. PMI currency shall be measured daily and determined according to the following formula:

$$\frac{\text{(Total Number of Vehicles)} - \text{(Vehicles not PMI Current)}}{\text{(Total Number of Vehicles)}}$$

Once a PMI is performed on a Vehicle, even if the PMI is late, that Vehicle shall be considered "current" until the next scheduled PMI. This measure assumes Customer's cooperation in bringing the Vehicles in for scheduled PMIs and shall not include Vehicles that are unavailable to Ryder, such as, but not limited to, Vehicles in the body shop or at the dealer for warranty or recall work.

Should Ryder fall below the 94% PMI currency standard for any month then 0.25% shall be deducted from Ryder's Total Charges for such month. The PMI currency standard for a month shall be the average of all daily PMI currency measurements for that month.

Driver Deficiency Completion Standard: 85% of the driver deficiency reports shall be completed within 3 working days, with the exception of reports that require repairs involving parts to be ordered, work to be subcontracted, major repairs to be performed, or reports involving warranty/recall, accidents, theft, vandalism, misuse, or acts of nature.

Deductions shall be calculated based on the number of drive deficiency report work orders that are completed for the month. The number of driver deficiency report work orders completed within 3 working days divided by number of driver deficiency report work orders completed (less work orders that do not qualify based on the above criteria). Should Ryder fall below the 85% completion rate then 0.25% shall be deducted from Ryder's Total Charges for such month.

Ryder shall provide reports on the above performance standards on a monthly basis. In the event Ryder does not meet a performance standard in any month for any reason other than the negligence or willful misconduct of Ryder or its employees, agents, subcontractors or invitees or Ryder's violation of this Agreement, the parties agree to meet to determine the cause(s) for not meeting the performance standard and to mutually agree on the steps necessary to eliminate such cause(s).

Customer and Ryder shall meet monthly to review performance standards and determine if any deductions apply. Deductions, if any, shall be applied to the next month's Total Charges. Any deductions taken in accordance with this Exhibit A shall be in addition to, and not in lieu of, any other rights and remedies available to Customer.

This Exhibit A is intended solely to define the term "Performance Standards", and nothing in this Exhibit A shall in any way modify, amend or abrogate any of the provisions of the Agreement or either party's obligations thereunder.

<u>Exhibit B</u>
<u>Vehicle Condition Standards</u>

1.  <u>Engine</u>:

     a.   Engine must operate at a minimum of 80% of the original manufacturer's rated horsepower after allowing for driveline losses and as verified by a chassis dynamometer test.

     b.   Engine must be mechanically sound and within the manufacturer's specification with regard to oil pressure, and fuel and rail pressures.

     c.   Engine must have no oil or coolant leaks.

     d.   Electronic engines must retain mileage information and be cleared of all passwords.

     e.   Engines crankcase blowby must not exceed:

          i.     12 inches of water column for Cummins

          ii.    3 inches of water column for Caterpillar

          iii.   4 inches of water column for Detroit

          iv.    4 inches of water column for Mack

     f.   Batteries, starter, alternator and other ignition system components must be in sound condition and capable of starting and charging under own power.

     g.   Battery cases must be intact with no dead cells.

     h.   Air conditioning compressor must be operational. System must be free from defect, and blow cold air.

     i.   All instruments and gauges must be in operating condition.

2.  <u>Drivetrain</u>:

     a.   Clutch, transmission and front and rear axles must be roadworthy and free from defects with no visible bends, cracks and leaks.

     b.   The driveline must be free of noise, vibration and excessive free-play in u-joints.

     c.   No wheel or pinion seals are to be leaking.

3.  <u>Brakes</u>:

     a.   Brakes must pass DOT inspection with 50% remaining visible brake linings. Brake drums must be free from breaks or cracks.

     b.   All drum rotors must be within useable tolerance.

4.    Tires:

    a.    All tires are to have a minimum of 50% remaining tread depth as measured on a fleet average basis. Tires must have sound casings without cuts or bulges. There must be no irregular tread wear.

5.    Refrigeration Units:

    a.    Refrigeration units must include all components originally installed, including electrical.

    b.    Units must be completely free of any Freon leaks, and be able to hold system pressure as designated by the manufacturer. Complete unit, including any evaporators, must be in working condition as designed.

    c.    Unit must cool and/or heat to the temperature set, pull down and hold set temperature throughout the running cycle.

    d.    Compressor must pass leakage and acid test. Engine must pass manufacturers blow by tests.

    e.    All instruments and gauges must be in operating condition.

6.    Refrigerated Trailers:

    a.    All components installed must be in working condition as designed.

7.    Inspection:

    a.    All units must be able to pass DOT Inspection, and go into service.

## Exhibit C

### Pricing for Vehicles Added to Coverage Under Agreement

1      Vehicles added to coverage under this Agreement that are placed in service hereunder as new shall be at the following rates ("New Vehicle Pricing"):

| Vehicle Type | Fixed Charge per Month |
|---|---|
| Refrigerated Straight Truck w/ cold plate | ▆▆▆ |
| Refrigerated Straight Truck w/ mechanical | ▆▆▆ |
| Tandem-axle conventional tractor | ▆▆▆ |
| Single-axle conventional tractor | ▆▆▆ |
| Tandem-axle refrigerated trailer | ▆▆▆ |
| Single-axle refrigerated trailer | ▆▆▆ |
| Add: Side lift gate to Straight Truck or Trailer | ▆▆▆ |
| Add: Rear lift gate to Straight Truck or Trailer | ▆▆▆ |

The New Vehicle Pricing set forth herein shall remain in effect for a period of 3 years from the Effective Date of this Agreement and shall be subject, during that period, to adjustment based on the CPI Index in accordance with the terms of Paragraph 13 of this Agreement.

The New Vehicle Pricing is based on the assumptions that (i) new Vehicles will have substantially similar specifications, application and utilization as Vehicles placed in service as of the Effective Date of this Agreement, and (ii) the scope of Services for new Vehicles will be the same or less as those Vehicles placed in service as of the Effective Date. If such assumptions are not correct with respect to any Vehicle that Customer proposes to place in service as new, the parties shall negotiate the applicable rates and charges for such Vehicles at the applicable service location in good faith.

2.      The Fixed Charge per month for Vehicles added under this Agreement that are not new when placed in service shall be based on the rates and charges in effect for Vehicles of like age, make, model and specifications at the applicable Ryder Service Location. If no comparable vehicles are in-service at the applicable Ryder Service Location on the date such Vehicles are added to this Agreement, then Customer and Ryder shall negotiate the applicable rates and charges for such Vehicles in good faith.



**RPM AGREEMENT**
**SCHEDULE E**

| Customer Name:<br>MIDWEST ICE CREAM<br>COMPANY, LLC | Schedule E No.<br>2008-001 | Schedule E Date:<br>April 1, 2008 | RPM Date:<br>April 1, 2008 | Lessee Number:<br>25678 |
|---|---|---|---|---|

1. **Vehicle:** Each of the 37 vehicles (each a "Vehicle" and collectively the "Vehicles") listed in Appendix A to this Schedule E shall be a Vehicle (as that term is defined in Section 1 of the Programmed Maintenance Agreement (the "RPM Agreement")). Each Vehicle and Appendix are expressly incorporated into this Schedule E and the RPM Agreement by reference and the terms of the RPM Agreement and this Schedule E shall apply to each Vehicle as if listed directly hereon.

2. **Vehicle Terms and Component Information:** Additional terms and component information specific to each Vehicle are listed on the applicable Appendix.

3. **Per Vehicle Annual Allowances:** The allowances described below are included in the Fixed Charge per Month. If the actual cost of any item(s) listed below, including any costs incurred in states other than those listed, exceeds the annual allowance amount for that item, then you agree to pay Ryder the excess, in addition to all other maintenance charges.

| Description | Annual Allowance Amount |
|---|---|
| Vehicle listed on this Schedule E operate in States of: IL | |
| State Motor Vehicle License and Registration | $0 |
| IFTA / Mileage Tax Permits | $0 |
| Federal Heavy Vehicle Use Taxes | $0 |

4. **Vehicle Related Services:**

| Vehicle Related Services | Provided By/Comments |
|---|---|
| Substitute Vehicles | Not provided |
| Exterior Washing | Not provided |
| Licensing | Customer |
| IFTA/Mileage Tax Permitting & Reporting | Customer |

If there is a conflict between the terms of this Schedule E and any other terms of the RPM Agreement, then the terms of this Schedule E will apply.

**RYDER TRUCK RENTAL, INC., d/b/a**
**RYDER TRANSPORTATION SERVICES**
(Ryder)

By: _____

Name: Richard Cibos

Title: Group Director National Sales

Date: 3/27/2008

**MIDWEST ICE CREAM COMPANY, LLC**

(Customer/You)

By: _____

Name: Michael L. Ahart

Title: Vice President

Date: 3/27/08